**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**STEVEN A. CUCCI,**

                    **Plaintiff,**                              **6:04-CV-139**
          **v.**                                                **(NAM/DEP)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

                    **Defendant.**
_____

**APPEARANCES:**                                    **OF COUNSEL:**

*For Plaintiff*
Law Office of Peter W. Antonowicz                   Peter Antonowicz, Esq.
1300 Floyd Avenue
Rome, New York 13440

*For Defendant*
Glenn T. Suddaby                                    William H. Pease
United States Attorney for the                      Assistant United States Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198

Office of General Counsel                           Barbara L. Spivak
Social Security Administration                      Chief Counsel, Region II
26 Federal Plaza
New York, New York 10278                            Susan Reiss
                                                    Assistant Regional Counsel

**Norman A. Mordue, Chief Judge:**

               **MEMORANDUM-DECISION AND ORDER**

**I.        INTRODUCTION**

          Plaintiff Steven Cucci brings the above-captioned action pursuant to 42 U.S.C.  § 405(g)

and 1383(c)(3) of the Social Security Act, seeking review of the Commissioner of Social

Security's decision to deny his application for Supplemental Security Income (SSI) benefits.  This

matter was referred to United States Magistrate Judge David E. Peebles for a Report-

Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(d).  Magistrate Judge

Peebles recommended that this Court affirm the Commissioner's decision denying disability

benefits and dismiss the complaint.  Presently before the Court are plaintiff's objections to the

Report and Recommendation.

## II.    FACTUAL BACKGROUND

Neither party has objected to Magistrate Judge Peebles's recitation of the background in

this case.  Accordingly, the Court adopts the portion of the Report and Recommendation entitled

"Background" in its entirety:

> Plaintiff was born on January 21, 1979; at the time of the second hearing in this
> matter, held on January 9, 2002, plaintiff was twenty-two years old. Administrative
> Transcript at pp. 72, 636.  Plaintiff is not married and, at the times relevant to his
> claims, has been a student –initially in high school, and later locally at LeMoyne
> College.  AT 72, 636-38.  Plaintiff has also engaged in part-time employment with
> two local retail establishments, working two to three days each week for between four
> and five hours each day.  AT 638-40.  In January of 1995, plaintiff began
> experiencing severe pain in his left leg.  AT 640.  Efforts by health care providers,
> including at the Utica Hospital emergency room, to address the problem were
> unsuccessful.  *See* AT 641-43.  Plaintiff was diagnosed in October of 1995 as
> suffering from Ewing's sarcoma of the left femur, based upon results of x-ray testing
> revealing the presence of a tumor.  [FN3 Ewing's sarcoma is a highly malignant,
> metastatic, primitive small round cell tumor of bone, usually occurring in the
> diaphyses of long bones, ribs, and flat bones of children or adolescents. It is
> characterized by saucerization of the cortex, patchy, permeative destruction, and often
> a large soft tissue mass; the most common symptoms include pain, swelling,
> leukocytosis, and fever. Dorland's Illustrated Medical Dictionary 630, 1600, 1896
> (29th ed. 2000).]  AT 452-55.  Initial treatment of the disease included a year long
> regimen of chemotherapy, beginning in November of 1995, and an operation
> performed on February 14, 1996 at Massachusetts General Hospital in Boston,
> Massachusetts involving a wide excision and allograft reconstruction with hardware.
> AT 126, 285, 452-55.  By all accounts plaintiff recovered well from his surgery, to
> a point where he was able to walk with the aid of crutches in September and October
> of 1996, with the ability for partial weight bearing of thirty to forty pounds, AT 285,
> 289, and in or about February of 1997 was capable of ambulating without the use of
> crutches.  AT 647-48; *see also* AT 243, 246, 385.  In March of 1997 plaintiff was
> cleared by his surgeon, Dr. Mark C. Gebhardt, to play golf.  AT 347-48.

On January 6, 1998 plaintiff underwent a second surgical procedure to address the fact that the cadaver femur placed in his left leg was not healing properly, placing undue stress on the plates and screws in his leg. AT 375-76, 392, 395, 576, 649. According to records associated with that surgery, plaintiff was able to ambulate independently during physical therapy four days post surgery. AT 394. Three months later, in April of 1998, plaintiff's physical therapist noted that he was able to bear up to sixty pounds on his left leg with the assistance of crutches. AT 468, 481, 484. In August of that year plaintiff was reported to be eighty percent partial weight bearing with crutches, and able to walk two hours without rest. AT 487-88. A week later, plaintiff was considered to be one hundred sixty pounds weight bearing. AT 493.

Following his January, 1998 operation, plaintiff did well until in March of 1999 he began experiencing increased thigh pain. AT 557. X-rays revealed a fracture of the allografted left femur, requiring an additional surgery to remove hardware, perform revision of the DCS plate, and revascularize his fibular graft. *Id*.

Plaintiff again did well following this surgery until experiencing increased left thigh discomfort. AT 557. X-rays revealed a new fracture through the distal portion of the allograft, requiring a left distal femoral replacement. *Id*.; *see also* AT 505, 584. Following the surgery, plaintiff stated that he felt "pretty comfortable." AT 505-06. Plaintiff was given wooden crutches to go home, and reported minimal pain in his left leg. AT 513.

Plaintiff again underwent surgery on October 5, 2000 for patellar resurfacing, to address pain experienced by him in his left knee. AT 589, 653. A report of an office visit from four months later on February 21, 2001, reflects that by that time plaintiff's knee pain had subsided, and he plaintiff was "walking without any ambulatory aides [sic]." AT 589.

In April of 2001 plaintiff reported experiencing renewed pain in his left knee, as well as in his hip. AT 592. Plaintiff's hip pain was diagnosed as "[p]robable plate bursitis, left hip, with involvement of the greater trochanteric bursa", for which an injection of Depo-Medrol was administered. *Id*.

Reports of a subsequent office visit to Dr. Timothy A. Damron, an oncologist, on October 19, 2001 reflect that plaintiff has remained "disease free" since his initial onset and treatment, with no more than "the usual minor aches and pains about his left knee." AT 593. During that visit plaintiff's range of motion was found to be good, with some pain associated with that motion, and the presence of low back pain "most likely related to paraspinous muscle strain" was noted, for which physical therapy was prescribed. *Id*.

On March 21, 2002 plaintiff underwent surgery, described as a "left total knee arthroplasty revision". AT 613-14. That surgery appears to have been successful, and plaintiff was subsequently discharged to be "weight bearing as tolerated on his left total knee arthroplasty." *Id*. During an examination conducted a short time later on

April 5, 2002, plaintiff was found to be well healed with "good range of motion of his knee and good strength."  AT 609.  Upon his return to see Dr. Damron on July 3, 2002, plaintiff reported that he was not using any ambulatory aids and was found, upon examination, to have good heel and toe walking.  AT 607.

On July 13, 2002, while shopping at a local mall, plaintiff reinjured himself when stepping off a stair, causing a sharp pain in his left thigh.  AT 612.  Upon admission to University Hospital plaintiff was found to be suffering from a periprostatic left femur fracture, and subsequently underwent surgery on July 15, 2002 for open reduction, internal fixation of the left femur fracture with periprostatic bone grafting on July 15, 2002.  *Id.*  Upon his discharge plaintiff was directed to remain "touch down weight bearing" for six weeks, and to use crutches for ambulation.  AT 613; *see also* AT 618-23.  Four months later, plaintiff was advised by Dr. Damron to advance to a single crutch, and to increase his weight bearing by twenty to thirty pounds per week over the following several weeks.  AT 600, 601.  Plaintiff was cleared to return to his desk job on August 30, 2002.  AT 604.  While by all accounts recovery from the July 15, 2002 surgery was uneventful, a communication dated March 21, 2003 from plaintiff's treating physician, Dr. Damron, reflects the existence of new failures and suggests the need for further surgery.  AT 627-28.

Report and Recommendation, pp.3-8.

## III.    ADMINISTRATIVE LAW JUDGE'S DECISION

To be eligible for SSI benefits, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months".   42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the SSA bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted)).

In this case, the Administrative Law Judge ("ALJ") found at step one, that plaintiff has never engaged in substantial gainful activity. At the second step, the ALJ determined that plaintiff's musculoskeletal impairments were severe. At the third step, the ALJ concluded that plaintiff's impairments neither met nor equaled any impairment listed in Appendix 1 of the Regulations. At the fourth step, the ALJ found that plaintiff could lift up to 10 pounds, sit for 6 hours, and stand for 2 hours during an 8-hour work day. The ALJ therefore found that although plaintiff could not push or pull with his legs, had the residual functional capacity for sedentary work, diminished by a nonexertional limitation which precludes him from work around hazards such as moving machinery or heights. Relying on the medical-vocational guidelines ("the grids") set forth in the Social Security regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that there are jobs in sufficient numbers within the national economy that plaintiff can perform despite his non-exertional limitations. The ALJ concluded that plaintiff was not disabled and denied his application for SSI benefits. The Appeals Council denied plaintiff's request for review, making the ALJ s decision the final decision of the Commissioner. This action followed.

## IV.    REPORT AND RECOMMENDATION

In the Report and Recommendation, Magistrate Judge Peebles found that: (1) plaintiff's condition does not meet or equal that of listing 1.06, which relates, *inter alia*, to femur fractures, since he cannot satisfy the requirement that he was unable to ambulate for any period of at least twelve months; and (2) there is substantial evidence in the record to support the ALJ's finding that plaintiff retains the ability to perform a full range of sedentary work. Accordingly,

Magistrate Judge Peebles recommended that the Court grant the Commissioner's motion for judgment on the pleadings, affirm the Commissioner's finding that plaintiff is not disabled, and dismiss the complaint.

Presently before the Court are plaintiff's objections to the Report and Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(c), this Court engages in a *de novo* review of any part of a Report and Recommendation to which a party specifically objects. Failure to object to any portion of a Report and Recommendation operates as a waiver of further judicial review of those matters. *See Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Secretary of Health & Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989).

## V.    DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence" or when a decision is based on legal error. 42 U.S.C. § 405(g); *Shaw*, 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. As noted, the Court also reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).

In his objections, plaintiff argues: (1) that the Magistrate Judge failed to address the issue of whether plaintiff's impairments were medically equivalent to a listed impairment; and (2) the ALJ's determination that plaintiff has the residual functional capacity to perform sedentary work is not supported by substantial evidence.

### A.    Medical Equivalence

Plaintiff concedes that his condition does not specifically meet the listed impairment for a femur fracture, but argues that there is substantial evidence in the record to support a finding that his condition is medically equivalent to the "Fracture of the femur" impairment listed in Appendix 1 of the Social Security regulations.  20 C.F.R. pt. 404, Subpt. P, Appendix 1 § 1.06. Appendix 1 lists the following impairment for a femur fracture:

> 1.06    Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones.  With:
>
> A.    Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and
>
> B.    Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur *within* 12 months of onset.

20 C.F.R. pt. 404, Subpt. P, Appendix 1 § 1.06 (emphasis added).  Appendix 1 also explains what it means to "ambulate effectively":

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. pt. 404, Subpt. P, Appendix 1 § 1.00(B)(2)(b).  "For a claimant to qualify for benefits

by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a

listed impairment, he must present medical findings equal in severity to *all* the criteria for the one

most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *see also* 20 C.F.R.

§§ 404.1526(a), 416.926(a) ("[A claimant's] impairment is medically equivalent to a listed

impairment if the medical findings are at least equal in severity and duration to the listed

findings.").

　　　　Plaintiff argues that there is no evidence that he was able to ambulate effectively "for" a

12 month period.  But that is not what the standard requires.  In order to equal the impairment

listed in Appendix 1, the evidence must show, *inter alia*, that "return to effective ambulation did

not occur or is not expected to occur *within* 12 months of onset."  Here, the evidence shows that

following each surgery, or set back, *i.e.*, a broken femur or its failure to heal to a solid union,

plaintiff returned to effective ambulation *within* 12 months.  For instance, plaintiff fractured his

femur on July 13, 2002, and required surgery.  Approximately 6 months later, Dr. Damron

advised plaintiff to advance to a single crutch.  AT 600, 601.  Thus, the ALJ's conclusion that the

medical findings do not meet or equal the requirement that plaintiff's "return to effective

ambulation did not occur or is not expected to occur within 12 months of onset" is supported by

substantial evidence.  20 C.F.R. pt. 404, Subpt. P, Appendix 1 § 1.06.

　　　　Plaintiff further argues that the evidence shows the permanence of his inability to

ambulate effectively.  Plaintiff points to Dr. Damron's March 2003 letter stating that plaintiff had

incurred failure of the fixation for the fracture and required further surgery and that he was trying

to get a scooter for plaintiff.  Dr. Damron further states that:

> With each operative procedure, we certainly hope that that would be the final
> procedure at least for quite some time, but Steven's problems have been complicated

> by numerous sequential complications and setbacks . . . .  He will have to deal with
> this for the rest of his life.  There is no way to predict how frequent or intermittent
> these problems would be.

AT 627.  Although this evidence demonstrates the recurrent nature of plaintiff's problems, it does

not contradict the evidence which shows that plaintiff returned to effective ambulation "within 12

months" of each setback.  20 C.F.R. pt. 404, Subpt. P, Appendix 1 § 1.06.  Indeed, Dr. Damron

acknowledges that "[t]here is no way to predict how frequent or intermittent these problems

would be."  Further, the letter contains no specific medical findings which would provide

substantial evidence of an inability to ambulate effectively.  Although it is reasonable to conclude

that Dr. Damron was trying to get a scooter for plaintiff because plaintiff was having difficulty

ambulating, there are no medical findings regarding whether Dr. Damron believes plaintiff

requires such an aid permanently or the extent to which plaintiff would need to utilize a scooter to

carry out his daily activities.  Moreover, as discussed, there is substantial evidence to support the

ALJ's conclusion that plaintiff's condition did not meet or equal the impairment listed at

Appendix 1, § 1.06.  Accordingly, the Commissioner's conclusion that plaintiff's condition does

not equal the listed impairment is supported by substantial evidence.

### B.    Residual Functional Capacity

The ALJ determined that plaintiff has the residual functional capacity to perform a full

range of sedentary work so long as it did not involve heavy machinery or heights.  Plaintiff

challenges this determination arguing that: (1) the ALJ did not consider plaintiff's inability to

sustain this level of activity for more than brief periods of time due to re-injury or surgery and

should have accorded controlling weight to Dr. Damron's most recent letter; (2) the ALJ did not

consider the functional capacity evaluation Dr. Gebhardt prepared, and, in the absence of

evidence that plaintiff fully recovered, should not have relied on Dr. Gebhardt's prospective

statements about what plaintiff's limitations would be after full recovery; (3) the ALJ improperly

discounted plaintiff's allegations of pain; and (4) the ALJ did not consider plaintiff's

nonexertional impairments and erred by relying on the grids rather than employing a vocational

expert to determine whether there are jobs plaintiff has the residual functional capacity to

perform.

Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC
> is the individual's maximum remaining ability to do sustained work activities in an
> ordinary work setting on a regular and continuing basis, and the RFC assessment must
> include a discussion of the individual's abilities on that basis. A 'regular and
> continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work
> schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling

Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996

WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination,

the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including

pain and other limitations which could interfere with work activities on a regular and continuing

basis.  20 C.F.R. § 404.1545(a).

In this case, the ALJ found that plaintiff has the residual functional capacity to perform

sedentary work.  Sedentary work is defined as:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally
> lifting or carrying articles like docket files, ledgers, and small tools. Although a
> sedentary job is defined as one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job duties. Jobs are sedentary if
> walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).  The ALJ determined that plaintiff could lift up to 10 pounds, sit for 6

hours during an 8-hour workday, and stand or walk for 4 hours during an 8-hour workday.  The

ALJ further found the evidence showed that as a result of his impairment plaintiff could not push

or pull with his legs and could not work around hazards such as moving machinery or heights. Based on these findings, as well as plaintiff's age, educational background, and work experience, the ALJ, relying on the grids, concluded plaintiff was not disabled.

The record contains functional capacity evaluations from three of plaintiff's treating physicians, Drs. Gebhardt, Damron, and Kennedy,[1] which support the ALJ's conclusion that plaintiff can sit for 6 hours in an 8-hour day as all of plaintiff's treating physicians opined that plaintiff could sit for 8-hours.  Further, Dr. Gebhardt, who evaluated plaintiff when he was recovering from surgery opined that when plaintiff had recovered, plaintiff could walk or stand for 2 to 4 hours in an 8-hour day.  Dr. Damron indicated that plaintiff could walk or stand for 1.5 hours in an 8-hour day, and Dr. Kennedy indicated that plaintiff's impairment did not inhibit his ability to walk or stand.  Plaintiff's treating physicians uniformly stated that plaintiff could not push or pull, and Drs. Gebhardt and Damron stated that plaintiff could not perform work involving heights or heavy machinery.  Thus, the ALJ's determination regarding plaintiff's residual functional capacity to sit for 6 hours and stand or walk for 2 hours in an 8-hour work day, with the above-referenced limitations is supported by substantial evidence.  Accordingly, the Court turns to plaintiff's remaining arguments.

### 1.    Setbacks/Surgeries

Plaintiff asserts that the ALJ failed to consider, in assessing plaintiff's residual functional capacity, his inability to sustain the sedentary level of work for more than brief periods of time. In support of his argument plaintiff relies on the March 2003 letter from Dr. Damron.  In it, Dr. Damron states that plaintiff had a failure of the fixation for the fracture that required surgery and

---

[1] These physicians completed the functional capacity evaluations in 1998, *prior* to plaintiff's injuries and surgeries in 1999, 2000, and 2002.  Plaintiff, however, has not argued that the ALJ failed to develop the record even though the ALJ relied on functional capacity evaluations from 1998 which could not account for or address his condition following the surgeries he had between 1999 and the date of the hearing.  In any event, there is no medical evidence contradicting the findings in those evaluations.

that plaintiff "will have to deal with" problems with his leg for the rest of his life.  Dr. Damron also states that he considers plaintiff to be permanently disabled and that he is trying to get him a scooter.

As discussed, although the record shows plaintiff's repeated setbacks and numerous surgeries, all of which are related in some way to his left leg and during which time plaintiff was unable to work, *see e.g.*, AT 380-83 (post-surgery functional capacity evaluation by Dr. Gebhardt outlining a functional capacity which would place plaintiff at less than the sedentary level of work), the record also shows a period of recovery after each setback or surgery to the point where plaintiff was able to ambulate without crutches in less than 12 months.  Further, "regular and continuing basis" means the ability to work 8 hours a day 5 days a week. *Melville*, 198 F.3d at 52.  Thus, Dr. Damron's letter, even if credited, does not provide evidence that plaintiff's impairment would prevent him from working 40 hours in a week.  Indeed, Dr. Damron indicates that there is "no way to predict how frequent or intermittent these problems would be" and provides no specific medical findings.  Accordingly, the Court finds plaintiff's argument without merit.

### 2.    Dr. Gebhardt's Functional Capacity Evaluation

Plaintiff next argues that the ALJ failed to consider Dr. Gebhardt's opinion regarding plaintiff's functional capacity following surgery.  Dr. Gebhardt completed a functional capacity evaluation dated March 24, 1998.  In this evaluation, Dr. Gebhardt offered two opinions: one regarding plaintiff's functional capacity while recovering from his recent surgery ("post-surgery"); and one regarding what Dr. Gebhardt believed plaintiff's functional capacity would be once he had fully recovered from surgery ("prospective").  Plaintiff argues that in the absence of evidence of a full recovery, the ALJ should have relied on the post-surgery functional capacity

evaluation, not the prospective functional capacity evaluation.  Plaintiff further asserts the prospective functional capacity evaluation was unreliable since it did not account for his condition following a number of subsequent surgeries.

While it is not clear from the decision whether the ALJ relied on either aspect of Dr. Gebhardt's functional capacity evaluations, the ALJ's findings regarding plaintiff's functional capacity are consistent with the prospective evaluation, which supports a finding of a functional capacity for sedentary work.  Dr. Gebhardt's post-surgery functional capacity evaluation, however, supports a finding of disability because it indicates that although plaintiff could sit for 8 hours, he could not lift more than 5 pounds, and could stand or walk for less than one hour.  This opinion, however, is not consistent with the other evidence in the record, including the functional capacity evaluations of plaintiff's other treating physicians, both of whom completed evaluations several months *after* Dr. Gebhardt's post-surgery evaluation and offered opinions that are consistent with Dr. Gebhardt's prospective opinion.  Thus, plaintiff's argument is without merit.

### 3.      Pain

Plaintiff takes issue with the Commissioner's rejection of his complaints of disabling pain. Plaintiff argues that the ALJ's finding is not supported by substantial evidence and that the Commissioner failed to offer a detailed explanation for finding plaintiff's complaints less than wholly credible. When the evidence demonstrates a medically determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence[.]"  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).   The ALJ, however, retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain

alleged by the claimant." *Marcus*, 615 F.2d at 27.  When a claimant's testimony regarding pain

suggests a greater severity of impairment than can be shown by objective medical evidence, the

ALJ must consider the following factors in evaluating a claimant's symptoms and complaints of

pain: (i) daily activities; (ii) the location, duration, frequency, and intensity of pain or other

symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side

effects of any medication taken to alleviate pain or other symptoms; (v) treatment, other than

medication, received for relief of pain or other symptoms; and (vi) any measures used to relieve

pain or other symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3)(I)-(vi), 416.929(c)(3)(i)-(vi).  When

rejecting subjective complaints of pain, an ALJ must do so "explicitly and with sufficient

specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's

disbelief[.]" *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987).  If the Commissioner's

findings are supported by substantial evidence, "the court must uphold the ALJ's decision to

discount a claimant's subjective complaints of pain." *Aponte v. Secretary, Dep't of Health &

Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).

        In rejecting plaintiff's complaints of disabling pain, the ALJ explained that none of

plaintiff's treating physicians provided objective findings indicating that plaintiff was disabled;

medical treatment "often alleviated" plaintiff's symptoms; and plaintiff needs only over-the-

counter pain medication to regulate his condition.  The ALJ also cited plaintiff's activities,

including golf, a trip to Alaska (which plaintiff took as a recipient of a gift from the Make-A-

Wish Foundation), college attendance, and part-time employment as indicative of "successful

independent living" and thus inconsistent with his claims of disabling impairments.  The ALJ

noted that medical treatment of plaintiff's problems "appears to have often alleviated symptoms"

and pointed out that plaintiff used Tylenol, an over-the-counter medication, to handle pain in

finding that plaintiff's allegations of symptoms precluding all types of work were not entirely credible. While plaintiff obviously suffers some pain, and though there may be other ways to view this evidence,[2] the Court finds that there is support in the record for each of the reasons the ALJ cited for finding plaintiff's allegations that his symptoms were disabling were not entirely credible. Further, contrary to plaintiff's argument, the ALJ's decision, as summarized above, contains enough detail to enable the Court to discern the reasons on which the ALJ relied in discounting plaintiff's allegation of disabling pain.

### 4.    Vocational Expert

While noting that plaintiff had not challenged the ALJ's reliance on the grids to determine whether there were jobs plaintiff could perform despite his impairment, the Magistrate Judge concluded that the ALJ, having found that plaintiff could perform a full range of sedentary work, "properly" determined "at step five of the inquiry that a finding of no disability was required after consideration of the grid." Dkt. no.14, pp.24-25.  Plaintiff objects to this conclusion.  Plaintiff asserts the ALJ overlooked evidence that his impairment causes nonexertional limitations which erode the occupational base and preclude employment.  Consequently, plaintiff argues, the ALJ was not entitled to rely on the grids to sustain his burden at step five, but should have obtained testimony from a vocational expert regarding whether there were jobs he could perform despite his limitations.

Where, as here, the plaintiff has no past relevant work, the burden shifts to the Commissioner, at step five, to establish that the plaintiff nevertheless "retains a residual functional capacity to perform . . . substantial gainful work which exists in the national

---

[2] For example, plaintiff's trip to Alaska was as a recipient of a gift from the Make-A-Wish Foundation and there is no evidence regarding the activities he participated in on that trip. Further, the evidence shows that at one point plaintiff had to take time off from college and at least one of his part-time jobs due to pain and the emotional difficulties he suffers as a result of coping with his condition.

economy." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  Ordinarily, the ALJ need not

consult a vocational expert, and may satisfy this burden "by resorting to the applicable medical

vocational guidelines (the grids)".[3]  *Id*. (citing 20 C.F.R. Pt. 404, Subpt. P, App.2).  Sole reliance

on the grids, however, "may be precluded where the claimant's exertional impairments are

compounded by significant nonexertional impairments that limit the range of sedentary work that

the claimant can perform."  *Rosa*, 168 F.3d at 78.  Under these circumstances, to satisfy her

burden at step five, the Commissioner must "'introduce the testimony of a vocational expert (or

other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'"

*Id*. (quoting *Bapp*, 802 F.2d at 603).  Nonexertional limitations include difficulty tolerating

physical features of certain work settings, *i.e.* height and moving machinery, and also include

difficulty reaching, handling, stooping, climbing, crawling, or crouching.  20 C.F.R. §

416.969a(c)(1)(v) and (vi).

        In this case, as previously discussed, the ALJ found, and had a substantial basis for

finding, that plaintiff's exertional, or strength, limitations fit squarely within the definition of

sedentary work, and further, that his complaints of disabling pain were not entirely credible.

Thus, to determine whether the ALJ erred in relying exclusively on the grids in finding that

plaintiff could perform a full range of sedentary work, the Court must consider whether there is

substantial evidence in the record to support the ALJ's implicit conclusion that plaintiff's

nonexertional limitations do not significantly limit the range of work in the sedentary category for

which he is capable.

---

[3] "The grids 'take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.' Based on these considerations, the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy." *Rosa*, 168 F.3d at 78 (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (internal citation omitted)).

Here, the ALJ found that plaintiff's impairment precluded him from working around heavy machinery or heights.  There is no question that the record supports these findings.  There is, however, substantial evidence that plaintiff also had difficulty climbing, crouching, and crawling, but the ALJ did not acknowledge these limitations.  Indeed, Drs. Gebhardt and Damron stated in their functional capacity evaluations that plaintiff could never engage in these activities.  The record further indicates that plaintiff was limited in his ability to balance, stoop, and kneel.  Drs. Gebhardt, Damron, and Kennedy indicated that plaintiff could stoop occasionally and although they agree plaintiff's impairment limited his ability to balance and kneel, they disagreed as to the degree, i.e., whether he could do so occasionally or never.[4]  Thus, because plaintiff's nonexertional impairments (which go beyond a prohibition against working around heavy machinery or heights) limit his exertional capacities, the ALJ erred by relying on the grids to reach a determination that there was substantial gainful work which exists in the economy that plaintiff could perform.  *Rosa*, 168 F.3d at 78.

The Second Circuit has explained that "a remand is proper where the error is found in an ALJ's failure to apply correctly the distinction between cases where reliance on the grid suffices and those where the testimony of a vocational expert is essential to the denial of benefits."  *Butts v. Barnhart*, 388 F.3d 377, 387 (2d Cir. 2004).  Since the record in this case contains no testimony from a vocational expert, it is incomplete, and "'further findings' are appropriate 'to assure the proper disposition of [the] claim.'"  *Id.* (quoting *Rosa*, 168 F.3d at 83).  Thus the Court remands this case to the Commissioner for further findings consistent with this Memorandum-Decision and Order.

---

[4] Dr. Gebhardt indicated that plaintiff could balance occasionally, but never kneel; Dr. Damron indicated that plaintiff could kneel and balance occasionally; and Dr. Kennedy indicated that plaintiff could knee occasionally, but never balance.

17

The Second Circuit, "mindful of the often painfully slow process by which disability determinations are made, and that a remand for further evidentiary proceedings (and the possibility of further appeal) could result in substantial, additional delay" has instructed "in cases involving an ALJ's failure to call a vocational expert, district courts that select remand as a remedy should consider imposing a time limit on the subsequent proceedings". *Id.* (quotation marks and citations omitted).  The Court finds that the length of time this matter has been pending, approximately 9 years, warrants the imposition of a time limit.  Accordingly, further proceedings before an ALJ must be completed within 60 days of the issuance of this Memorandum-Decision and Order and, if that decision is a denial of benefits, a final decision of the Commissioner be rendered within 60 days of plaintiff's appeal from the ALJ's decision.  If these deadlines are not observed, a calculation of benefits owed plaintiff must be made immediately.

**VI.   CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the Report and Recommendation is rejected to the extent it recommends a conclusion that the ALJ properly determined at step five that a finding of no disability was required after consideration of the grids; and it is further

**ORDERED** that the Report and Recommendation is otherwise accepted in its entirety; and it is further

**ORDERED** that this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum-Decision and Order, including the time limits outlined above; and it is further

**ORDERED** that if the time limits outlined above are not observed, the Commissioner must immediately calculate the benefits owed plaintiff.

**IT IS SO ORDERED.**

Dated: June 23, 2006
      Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge

19